***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Phillips, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding with some modification and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner on 12 November 2002 as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times and all claims and notices as required by law were properly and timely filed regarding all parties.
2. An employee-employer relationship existed between the Plaintiff and Defendant-Employer at all times relevant hereto.
3. On December 26, 1999, plaintiff sustained an alleged injury by accident to his right leg while employed with the Defendant-Employer.
4. As of the date of the accident, December 26, 1999, Legion Insurance Company was the carrier on the risk and Cameron Harris was the adjusting agent for the employer and carrier.
5. Exhibits indexed as "Stipulated Exhibits to Pre-Trial Agreement" attached at Tab 1 through 16 in addition to a videotape were received into evidence without need of further authentication subject to the right of either party to take the testimony of any of the witnesses identified in said records.
 *********** FINDINGS OF FACT
1. Plaintiff was born on February 28, 1974 and at the time of the hearing before the Deputy Commissioner was 28 years of age.
2. Plaintiff graduated from high school in the Tipton, Tennessee area. He attended college at Austin Peay State, but did not graduate.
3. In 1996, Plaintiff was not drafted as a professional football player but did, nevertheless, make the San Diego Chargers professional football team in the National Football League ("NFL") as a free agent. His primary duties, as throughout his career, were working on special teams such as the kick-off team, as well as the teams used to attempt to block extra points, punts, and field goals. He also played the position of cornerback on defense.
4. After playing two seasons with the San Diego Chargers, plaintiff was signed with the Carolina Panthers and held relatively the same responsibilities, those of playing cornerback as well as on special teams.
5. Plaintiff played with the Panthers for the 1998 1999 season as well as the 1999 2000 season.
6. Plaintiff, who is approximately 5'10'' tall, weighed between 170 and 180 pounds when he was playing professional football. The positions he played on special teams, as well as playing cornerback, required him to have the speed necessary to stop, start, cut and generally keep up with the offensive teams' receivers, some of the fastest people to play the game of professional football.
7. On or about July 27, 1999, plaintiff signed to play for the 1999 2000 season with the Carolina Panthers in return for payment of $325,000.00 payable in seventeen equal installments. The regular season is made up of 16 games but actually lasts for 17 weeks because one week, the "bye-week," is reserved for not playing.
8. In the 15th game of the 16-game regular season, while playing on special teams in a game against the Pittsburgh Steelers in Pittsburgh, Pennsylvania, plaintiff was lined up on the end of the line to attempt to get around the opposing team's players and block an extra point attempt. On that particular play, the opposing team bobbled the ball and the play broke down. In an attempt to get to the ball, Swift was knocked to the ground and at least one other player, and possibly two, fell on the back of his leg not only breaking his right fibula but also severely tearing the tendons in his ankle.
9. It was unexpected and unusual for a player to fall on Swift in this way so as to break his fibula and cause such a tear in his ankle tendon. At the time of injury, Swift was taking all reasonable measures to protect himself from injury given the nature of the game. At the same time, Swift was required to do what he was doing when injured and had no choice but to do it as best he could notwithstanding the risk of injury.
10. On December 27, 1999, after being flown back to North Carolina, plaintiff underwent surgery and insertion of hardware by Dr. D'Alessandro, the Panthers' team doctor, to repair his broken leg and ankle. He then returned to the Memphis, Tennessee area where he underwent physical therapy at Campbell Clinic.
11. When Plaintiff's contract for the 1999 2000 season expired, it was not renewed by the Panthers in that he was still on crutches and undergoing physical therapy for the serious and permanent injury to his ankle.
12. On or about March 9, 2000, Plaintiff returned to Dr. D'Alessandro, the Panthers' team physician who performed the original surgery, to have some, but not all, of the hardware removed from his leg. Plaintiff then returned to Memphis to continue his physical therapy.
13. Although his leg and ankle had not fully recovered, Swift, who had planned on making a career out of working in the NFL as a professional football player, tried out for another NFL professional football team, the Jacksonville Jaguars. Although he had continued symptoms with his ankle, he made the team. After his first game with the Jaguars, on September 5, 2000 plaintiff was released from the team because of limitations of speed and ability to maneuver as a result of the impairment from the ankle injury sustained while working with the Carolina Panthers. Swift's compensable work-related limitations made him more likely to be dismissed from the team relative to his teammates for reasons of relative performance.
14. Thereafter, several other professional football teams asked plaintiff to participate in tryouts, but he was unable to perform as necessary to make a team because of the symptoms associated with his injury by accident that occurred while employed with the Carolina Panthers, a North Carolina based team, on December 26, 1999.
15. The nature and severity of the injury sustained on December 26, 1999 were such that despite a lengthy period of rehabilitation, the injury was career-ending.
16. Finally, after having to give up pursing a career in the NFL as a football player because of the impairment and limitations of his ability associated with his ankle and leg injury, plaintiff next became employed outside of the NFL at the following jobs and positions with associated wages as follows: from Late November, 2000 until January 2001, plaintiff worked as an analyst for "Protein Technologies" making $12 per hour; from April 2001 through October 2002, plaintiff worked for "Uniform People" as a sales representative with an annual salary of approximately $35,000 per year; and beginning in October of 2002 until the present, plaintiff has been self-employed selling used computer equipment making an anticipated income of approximately $40,000 annually.
17. All of the jobs listed above reflect an honest attempt at earnings at the full exercise of his wage earning capacity outside of the NFL in that he was no longer capable of working as a player in the NFL.
18. In the NFL, a player's salary is based on his contract. In this case, the contract called for $325,000.00 to be paid in 17 equal payments immediately after each of the 16 games plus the single bye-week during the 17-week season. Subsequent to December 26, 1999, the date of his injury, Swift, who had played in the 15th game of the season, received that week's game check but had already earned it by the time of his injury during that game.
19. The very next week, after the 16th game was played by the Panthers, plaintiff received his 16th and final check for the 1999 2000 season. This game check for $19,118.00 was paid to Plaintiff under the disability provisions (also known as injury protection provisions) of paragraph 9 of the standard NFL Player Contract.
20. On or about December 31, 2001, Plaintiff received a $30,000.00 check for severance pay through the Panthers. This check was based on the collective bargaining agreement and the number of years he had played in the NFL. Although this check was paid subsequent to the injury, the entire amount — totaling approximately $30,000.00 was earned by Swift prior to the date of his injury based on his years of service in the NFL in that a player accrues a year of service once he plays in the third game of a particular season. The third game of the season had already passed in the 1999 2000 season prior to Swift's injury on December 26, 1999.
21. While playing with the Jacksonville Jaguars in September 2000, Michael Swift received $22,647.00, 1/17th of his yearly contract of $380,000.00 per year, for playing in one regular season game. He received nothing thereafter. This check reflects only one week for which Plaintiff had an earning capacity equal to or greater than that he had while playing with the Panthers. The other checks, totaling approximately $7,366.14, that were paid by the Jaguars between July 22, 2000 and September 5, 2000 for travel expenses, training camp, etc., when looked at over time would still yield an entitlement under G.S. § 97-30 that exceeds the maximum compensation rate of $560.00 in effect in 1999.
22. Plaintiff's average weekly wage is $6,476.90. This average weekly wage is calculated by dividing his yearly contract plus all other payments paid by the Panthers for the season in which the injury occurred. No other method of calculating the average weekly wage listed in G.S. § 97-2(5) would be fair to the parties or the plaintiff.Larramore v. Richardson Sports, Ltd., 141 N.C. App. 250, 540 S.E.2d 768
(2000) aff'd per curiam, 353 N.C. 520, 546 S.E.2d 87 (2001).
 ***********
The forgoing Stipulations and Findings of Fact engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff underwent a compensable injury by accident as a result of a compensable event arising out of and in the course of his employment with defendants on December 26, 1999. N.C. Gen. Stat. § 97-2(6).
2. Subject to the credit below, Plaintiff is entitled to partial disability compensation for 300 weeks dating from the date of his initial injury by accident at the maximum rate of $560.00 per week in effect in 2000. N.C. Gen. Stat. § 97-30.
3. Plaintiff is entitled to past and future medical monitoring and treatment pursuant to N.C. Gen. Stat. § 97-25 et seq.
4. Defendants are entitled to deduct one weekly compensation payment at the maximum applicable rate of $560.00 weekly from the 300 weeks of compensation otherwise due and owing pursuant to N.C. Gen. Stat. §97-30.
5. Exceptional reasons exist for using the method for calculating Plaintiff's average weekly wage that will most accurately approximate the amount that the injured employee would be earning were it not for the injury. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay directly to the Plaintiff compensation at the rate of $560.00 per week pursuant to the terms of N.C. Gen. Stat. §97-30 for a period of 299 weeks with the accrued relating back to December 27, 1999, to be paid in one lump sum and the balance to be paid over the remainder of the 299-week period so long as Plaintiff's yearly earnings are sufficient to yield the maximum compensation rate of $560.00 per week. Plaintiff will submit yearly earnings information necessary to verify his post-professional football earnings. All sums that have accrued shall be paid to plaintiff in a lump sum.
2. A reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation due plaintiff is approved and awarded to plaintiff's counsel as attorney's fees. This amount shall be paid as a part of the cost of this action and not deducted from Plaintiff's compensation. All sums that have accrued shall be paid in a lump sum.
3. Defendant shall pay to the Plaintiff all past and future medicals and related expenses resulting from his compensable injury by accident for so long as such treatment effects a cure, gives relief or tends to lessen Plaintiff's period of disability.
Defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER